IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | : | |
| | : | Case No. 1:13cr50-1 |
| Plaintiff, | : | |
| | : | Chief Judge Susan J. Dlott |
| v. | : | |
| | : | **ORDER DENYING** |
| **STARLING GROVES**, | : | **MOTION TO SUPPRESS** |
| | : | |
| Defendant. | : | |

      This matter is before the Court on Defendant Starling Groves's Motion to Suppress, Doc. 74.  The Court held a hearing on Defendant's motion on February 24, 2014, during which FBI Special Agent Peter Lakes and Montgomery County, Ohio Deputy Sheriff Rick Bergman testified for the Government.  For the reasons that follow, Defendant's motion is DENIED.

**I.    BACKGROUND**

      In or about August 2012, law enforcement officers in Warren County, Ohio began investigating a heroin trafficking organization operating in the city of Middletown led by Darnell Jack South.  As part of that investigation, the FBI obtained court authorization to intercept wire and electronic communications from South and another individual, Eric Redding.  FBI Special Agent Peter Lakes testified at the suppression hearing in this case that, pursuant to that authorization, on May 9, 2013, the FBI intercepted text messages between South and someone using a phone number with a Dayton, Ohio area code.  Based on previous calls that had been intercepted from both Redding and South, FBI agents believed that the individual using the Dayton phone number was a source of heroin supply.  The text messages between South and the individual with the Dayton phone number discussed a planned meeting between the two.  (*See*

1

Gov't Exs. 1A–E to 2/24/14 hrg.)  Agents determined that South and Redding planned to travel later that day from Middletown to Dayton to obtain heroin from the then-unknown source.  Agent Lakes notified law enforcement in Dayton of the suspected impending drug transaction, and Dayton officers agreed to pick up surveillance of South's car once it entered the Dayton area.

On May 9, 2013, agents from Warren County followed South and Redding as they left Middletown by car and traveled to Dayton.  Once in the Dayton area, the Warren County agents were joined in their surveillance by Montgomery County law enforcement.  These officers followed South to a residence located at 919 S. Broadway, Dayton, Ohio.  Deputy Sheriff Bergman of the Montgomery County Sheriff's Office, a member of the FBI Safe Streets Task Force, was part of the surveillance team.  Once at 919 S. Broad Street, Deputy Sheriff Bergman positioned himself in a place where he could clearly observe the front porch and driveway of the house.  Other officers were positioned so they could conduct visual surveillance of the front, back, and sides of the house.

Deputy Sheriff Bergman testified that he observed two individuals, South and Redding, get out of the car and meet with a man on the front porch of the house.  The three individuals then entered the residence and remained inside for ten to fifteen minutes.  Then, South and Redding came out of the house, got back in the car, and drove away.  Deputy Sheriff Bergman notified the FBI agents that the car was leaving.

At some point during his surveillance of the house at 919 S. Broadway, Deputy Sheriff Bergman ran the license plates of the two cars in the driveway; both were linked to the Defendant in this case, Starling Groves.  Deputy Sheriff Bergman was familiar with Groves

2

because he had been the focus of an earlier narcotics trafficking investigation by members of Bergman's task force.

When South and Redding left the residence at 919 S. Broadway, members of the Warren County task force followed them. They got back on the interstate highway and proceeded south, toward Middletown. Approximately half an hour later, South committed a traffic violation, and an Ohio State Highway Patrol officer made a traffic stop of the car. As the officer directed South to the rear of the cruiser, Redding fled on foot but was apprehended shortly thereafter. A search of the vehicle in which South and Redding were traveling yielded approximately 700 grams of a substance that appeared to be, and was later found to be, heroin. The heroin was in five "hockey-puck sized" portions. (Gov't Ex. 3 to 2/24/14 hrg.) The officers promptly alerted the FBI that they had stopped South, that Redding had attempted to flee on foot, and that there was heroin in the car.

Meanwhile, other law enforcement officers had remained at the S. Broadway address and were continuing surveillance of Groves. Approximately fifteen minutes after being notified that South had been pulled over and that heroin had been discovered in the car, Deputy Sheriff Rick Bergman observed Groves leave the house on S. Broadway, get in his car, and drive away. Bergman and other officers followed Groves and, after traveling a short distance, a Dayton officer in a marked police cruiser stopped Groves. There is no dispute that Groves did not commit a traffic violation but that he was stopped based on the cumulative information regarding Groves's interaction with South and South's arrest.

Groves was ordered out of the car at gunpoint and told to get on the ground. Deputy Sheriff Bergman then handcuffed Groves and told him he was under arrest. At that point,

officers searched Groves's person and found approximately $3,000 in cash as well as documents connecting Groves to another address, 509 S. Paul Laurence Dunbar Street, Dayton, Ohio.

After Groves was secured in the back of a police cruiser, Officer Tonina Lamanna and her canine Raika were called to the scene. Officer Lamanna and Raika had received special purpose canine training in the areas of tracking, article search, marijuana, cocaine, heroin, and methamphetamines and obtained certification of that training on April 26, 2013. (*See* Gov't Ex. 2 to 2/24/14 hrg.) When Officer Lamanna walked Raika around Groves's car, the canine positively alerted on the driver's side door.

Deputy Sheriff Bergman testified that his department's policy is to tow vehicles when their driver has been stopped and taken into custody. Pursuant to this policy, Groves's car was towed. Also pursuant to department policy, officers then conducted an inventory search of Groves's car. This search yielded two mobile phones and additional documents connecting Groves to 509 S. Paul Laurence Dunbar Street.

Agents then obtained authorization from Magistrate Judge Bowman to search the premises at 919 S. Broadway where Groves and South met. That search yielded currency, a powdery substance believed to be cocaine, and a press used to process heroin and cocaine. Following the search of the S. Broadway property, agents obtained authorization from Magistrate Judge Merz to search the premises at 509 S. Paul Laurence Dunbar. In addition to the warrants to search the Dayton premises, agents also obtained a warrant from Magistrate Judge Litkovitz to search the two cell phones discovered during the search of the car in which Groves was traveling when he was arrested.

Based on the information described above and additional information gathered by law enforcement officials pursuant to the above search warrants, in May 2013, Groves and five other individuals were indicted and charged with illegal narcotics trafficking.

## II. ANALYSIS

Groves makes five separate requests for relief in his motion: (1) the suppression of any evidence seized from his improper stop, detention, and the warrantless search of his vehicle, (2) a finding that the warrant to search 509 S. Paul Laurence Dunbar, Dayton, Ohio was invalid and the suppression of all evidence obtained as a result of that search, (3) a finding that the warrant to search 919 S. Broadway, Dayton, Ohio was invalid and the suppression of all evidence obtained as a result of that search, (4) the suppression of any evidence seized from the cell phones found pursuant to two search warrants, and (5) the suppression of any statements which Groves may have made as a result of his arrest. Groves's counsel has since withdrawn this fifth request for relief as the parties stipulated that Groves did not make any statements to the police during or following his arrest. Additionally, the Court need not consider argument related to the search of the cell phones because the Government recovered no evidence from the searches of those phones. Accordingly, the Court will address only the issues of Groves's stop and arrest and the subsequent residential searches.

### A. The Stop and Arrest

Groves asserts that his stop and arrest were not supported by probable cause and argues that, because his arrest was improper, the search of his person and vehicle were not valid pursuant to arrest. There is no dispute that law enforcement stopped Groves to arrest him. Thus, unlike a traffic violation stop to which the reasonable suspicion standard applies, Groves's stop must be supported by probable cause. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (holding

that to make an arrest, an officer must have "probable cause to believe that a criminal offense has been or is being committed.")

"Whether probable cause exists depends on the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id*. Groves contends that the only fact known to officers when they arrested him was that he interacted with South and Redding while they were under surveillance. He states that an arrest based solely on that information is unsupported by probable cause.

Groves is correct that mere association with known criminals or targets is insufficient to establish probable cause for an arrest. *See*, *e.g.*, *Ybarra v. Illinois*, 444 U.S. 85, at 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person."). However, Groves is incorrect that the only information available to the officers at the time of his arrest was that he had simply met with South and Redding.

The facts known to law enforcement at the time they arrested Groves were as follows: wire and electronic intercepts demonstrated that South and Redding planned to travel to Dayton, Ohio to obtain heroin; South exchanged text messages with someone using a Dayton area code setting up a meeting on May 9, 2013; on May 9, 2013, law enforcement followed South and Redding from Middletown to 919 S. Broadway in Dayton; South and Redding met Groves on the front porch of that residence, all three proceeded inside where they remained for approximately fifteen minutes, and then South and Redding emerged from the residence and got back into their car; law enforcement followed South and Redding as they proceeded immediately back to Middletown (not to another location within Dayton); South and Redding were stopped for a

traffic violation, at which time Redding ran from the officers and 700 grams of heroin were found in the car; and Groves was known to law enforcement because of an earlier investigation into narcotics trafficking.  Thus, law enforcement had significantly more information from which to establish probable cause than the mere fact that Groves met with two targets while they were under surveillance.

Groves points to information that law enforcement did *not* have in an attempt to substantiate his argument.  He notes that law enforcement did not see South and Redding carry anything out of 919 S. Broadway after meeting inside with Groves (implying that the heroin must have been in South's car the entire time) and that law enforcement should not have assumed that Groves was South's heroin supplier just because he had a Dayton area code.  Groves's argument is not compelling:  whether officers had probable cause to arrest Groves does not depend on what was *not* known.  Groves's arrest was supported by probable cause because the facts and circumstances known to law enforcement at the time Groves was stopped and arrested were sufficient to warrant a reasonably prudent officer to believe that a criminal offense was being or had been committed.

Groves contends that because his stop and arrest were improper, the evidence found on his person and in his car should be suppressed as fruits of the poisonous tree, citing *Wong Sung v. United States*, 371 U.S. 471 (1963).  However, this Court has determined that Groves's stop and arrest were supported by probable cause.  Accordingly, the search of his person was validly performed incident to his lawful custodial arrest.  *See United States v. Haywood*, 506 F. App'x 424, 428 (6th Cir. 2012) (citing *United States v. Robinson*, 414 U.S. 218, 236–37 (1973) (upholding search incident to lawful arrest)).  Further, the search of his vehicle was justified as an inventory search.  *See Colorado v. Bertine*, 479 U.S. 367, 374 (1987) (concluding that an

7

inventory search of a vehicle done pursuant to the police department's standardized procedures satisfied the Fourth Amendment). Because Groves advances no other argument for suppressing this evidence, his motion to suppress the evidence found on his person and in his car is DENIED.

### B. Property Searches

Groves's second and third suppression arguments pertain to the warrant-authorized searches of 509 S. Paul Laurence Dunbar and 919 S. Broadway. His challenge to the validity to these searches is two-pronged. First, he asserts that the affidavits supporting both warrant applications contained material misstatements and omissions and requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Second, he contends that the search warrants for the residences lacked probable cause.

#### 1. Request for *Franks* Hearing

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court recognized a defendant's right to challenge the sufficiency of a previously issued and executed search warrant. A defendant is entitled to a *Franks* hearing if he (1) makes a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement in or omitted a material fact from the affidavit, and (2) proves that the false statement or material omission is necessary to the probable cause finding in the affidavit. *Franks*, 438 U.S. at 171–72; *United States v. Bonds*, 12 F.3d 540, 568–69 (6th Cir. 1993) (applying the *Franks* doctrine to omissions). While material omissions can trigger the need for a *Franks* hearing, "an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997) (citing *United States v. Martin*, 920 F.2d 393, 398 (6th Cir. 1990)).

8

During the suppression hearing, the Court heard argument from both parties regarding whether Groves was entitled to a *Franks* hearing. Groves contended that the search warrant affidavits included omissions or inaccurate implications. For example, the affiant stated that when Groves was stopped and arrested, he had a large amount of currency on his person and that the affiant believed the money was part of the payment for the heroin recovered on South. Groves argued that, in fact, he had approximately $3,000 on him and the heroin recovered from South was 700 grams with a street value of approximately $50,000. Groves argued that if those specific amounts had been included in the affidavit, the magistrate judge would not have adopted the affiant's conclusion that the money was part payment for the drugs.

After hearing argument from both sides on Groves's challenges to the warrant application affidavits, the Court concluded during the suppression hearing that Groves had not sufficiently supported his allegation that the affiant's statements were made with reckless disregard for the truth. Accordingly, the Court denied his request for a *Franks* hearing.

### 2. Probable Cause

Groves next argues that the two different magistrate judges who issued the warrants to search 919 S. Broadway and 509 S. Paul Laurence Dunbar improperly concluded that probable cause existed to search those residences. The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause to search has been defined as a 'fair probability' that contraband or other evidence of a crime is likely to be found in the place cited." *United States v. Caidedo*, 85 F.3d 1184, 1192 (6th Cir. 1996). More particularly,

> [a] judge issuing a search warrant must "make a practical, commonsense decision whether, given all the circumstances set

9

> forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The issuing judge's determination is afforded great deference, and the duty of the reviewing court is to ensure that the affidavit provided the issuing judge "with a substantial basis for determining the existence of probable cause." *Id*. at 239, 103 S. Ct. 2317; *see also United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc).

*United States v. Yates*, 501 F. App'x 505, 509 (6th Cir. 2012). Thus, this Court must decide whether the affidavits supporting the search warrant applications provided Magistrate Judge Bowman and Magistrate Judge Merz with a substantial basis for determining the existence of probable cause to search the residences at 919 S. Broadway and 509 S. Paul Laurence Dunbar.

The affidavit in support of the warrant for 919 S. Broadway, as summarized by Groves, states the following: South and Redding were targets of a narcotics trafficking investigation. Agents believed they were going to Dayton to get heroin. They met with Groves on his porch in Dayton and left. They were stopped and heroin was found in their car. Groves was then stopped and money was found on his person. Based upon affiant's experience, traffickers often maintain evidence of their sales in their residence. (*See* Def. Post-Hearing Memo., Doc. 159, at Page ID 496.) Groves argues that this information is insufficient to support a finding of probable cause to search 919 S. Broadway. First, he states that there is no link between him and South and Redding other than that they met together. Second, he states there is no link between him and the residence at 919 S. Broadway because the property is not in his name. Finally, he states that the affidavit does not state that anything changed hands during his meeting with South and Redding at 919 S. Broadway, thus there is no link between that meeting, the contraband in South's car, and the money found on Groves.

The Government responds by noting that the warrant authorizing the search of 919 S. Broadway recited detailed information about the course of the investigation, the plan to travel to Dayton to meet the source of supply, the observed meeting, the immediate attempt of South and Redding to return to Middletown, the events of the traffic stop including Redding's flight from law enforcement, the recovery of heroin which was the object of South's trip to Dayton, and the opinions of the Special Agent as to the likelihood that evidence might be located at the S. Broadway address.  The Government contends that the magistrate judge's common-sense review of those facts led her to the reasonable and logical conclusion that there was a fair probability that contraband or evidence of a crime would be found in that particular place.

The Court agrees with the Government.  The search warrant affidavit established a sufficient nexus between drug activity and the residence at 919 S. Broadway so as to support the magistrate's determination of probable cause to issue the search warrant.  In particular, the affidavit linked Groves, South, and Redding to the residence at 919 S. Broadway because officers on surveillance observed them meet at that location after intercepting electronic communications concerning a planned meeting in Dayton to obtain heroin.  When South and Redding departed from their meeting with Groves and proceeded directly back to Middletown, they were stopped and found to have 700 grams heroin in their car.  When Groves was stopped shortly thereafter upon leaving 919 S. Broadway, he was found to have a large amount of cash on his person.  Taken together with the opinion of an affiant with training and experience in the field of narcotics trafficking, this information was sufficient to lead the magistrate judge to conclude that evidence of illegal activity could be found at the residence where these three individuals had just met.  *See*, *e.g.*, *United States v. Castro*, 364 F. App'x 229, 236 (6th Cir. 2010) (finding that a defendant's known association with an address, an anonymous tip

11

describing drug activity at that address, the officer's surveillance of that address, and the fact that heroin and a large amount of cash were found on the defendant's person soon after he left that address provided probable cause to issue a warrant to search the address).

When agents searched 919 S. Broadway, they recovered a large amount of currency, powdered substance believed to be cocaine, and a press used to process heroin and cocaine. An agent then prepared an affidavit in support of an application for a warrant to search Groves's residence at 509 S. Paul Laurence Dunbar Street. That affidavit included this discovery along with all the other background information regarding the investigation that was included in the affidavit to search the 919 S. Broadway residence. Further, the special agent stated in his affidavit that, in his experience with drug investigations, traffickers often maintain evidence related to drug trafficking activity in their residences.

An affidavit that contains evidence that an individual is engaged in illegal drug trafficking permits an inference that evidence of illegal activity would be found at that individual's residence. *See United States v. Gunter*, 551 F.3d 472, 481 (6th Cir. 2009) (finding that probable cause existed to search defendant's residence where other evidence indicated that defendant was engaged in ongoing drug trafficking); *United States v. Jones*, 159 F.3d 969, 974–75 (6th Cir. 1998) (finding that probable cause to search residence existed where defendant engaged in two recorded drug transactions outside of his residence because, "[i]n the case of drug dealers, evidence is likely to be found where the drug dealer lives"); *United States v. Holmes*, No. 07-20472, 2009 WL 136906 (E.D. Mich. Jan. 16, 2009) (despite the fact that affidavit did not state that defendant was observed dealing drugs from his residence, finding that details in affidavit provided substantial basis for magistrate to believe that evidence of drug

trafficking would be found at defendant's home when a co-defendant was found in possession of cocaine after stopping at defendant's house).

Further, an "issuing judge or magistrate 'may give considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense.'" *Caidedo*, 85 F.3d at 1192 (quoting *United States v. Lawson*, 999 F.2d 985, 987 (6th Cir. 1993) (internal quotations omitted)). Thus, in combination with specific evidence of an individual's drug trafficking activity, it is reasonable for a magistrate to defer to an attesting officer's experience that many drug traffickers use their homes to conduct illegal narcotics trafficking activity. *Id*. at 1193.

In this case, the agent described in his affidavit the evidence linking Groves to 919 S. Broadway street, which residence was found to contain evidence of illegal drug trafficking; South and Redding, who were arrested and found to have a large amount of heroin; and his residence at 509 S. Paul Laurence Dunbar; and further stated that his experience led him to believe that under the circumstances, evidence of illegal activity would be found at Groves's residence. Based on the totality of the circumstances, the Court concludes that the issuing magistrate had a substantial basis to conclude that there was probable cause that evidence of criminal activity would be found in Groves's residence.

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress is DENIED.

IT IS SO ORDERED.

S/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court

13